## NOTTBECK a. WILKS.

*Supreme Court, First District; Special Term, April,* 1857.

DEED.—DELIVERY IN ESCROW.—REVOCATION OF DEVISE.

Where a deed conveying real property *in presenti* is executed and delivered to a third party in escrow, with intent that it shall be delivered to the grantee upon the death of the grantor, this is a valid and effectual conveyance, taking effect from the time of such death.

A deed may be delivered by way of escrow, to be delivered to the grantee upon the happening of a future event, where such event is certain to come to pass, and cannot, in the nature of things be postponed longer than the continuance of an existing designated life.

By his will a testator devised four houses and lots to four of his granddaughters in common. He afterwards executed a deed conveying one of these houses and lots to one of the devisees, and this deed he delivered to his son, in escrow, to be delivered to the grantee, upon his, the grantor's, death. In the deed, which was drawn by the grantor, these words were added to the description of the premises, by metes and bounds:—" the said lot being part of the property mentioned in my bequest to the four daughters of Mrs. L."

*Held,* that this deed had the legal effect of altering the previous devise so as to give absolutely and beyond recall, and without limitation, the house and lot described therein to the grantee named, and the three remaining houses and lots, subject to revocation, jointly, and in a qualified manner, to the other three devisees.

Partition suit, tried by the court.

This action was brought by James Nottbeck and Cecilia, his wife, against Matthew Wilks, Eliza A., his wife, and several others, heirs of John Jacob Astor, and against William B. Astor, and others, executors of John Jacob Astor.

The facts out of which the action arose appear in the opinion.

Roosevelt, J.—The late Mr. Astor, it appears, some time before his death, executed to his granddaughter, Mrs. Boreel, one of the defendants, a deed for the house on Broadway, in which he then resided, and in which about a year afterwards he died, and for the lot connected with it, extending through to Mercer-street. Whether this instrument, under the circumstances detailed in the evidence, ever took effect, and if so, what is its operation upon the devise of the same and the adjoining premises to Mrs. Boreel and her three sisters, previously made by the will of Mr. Astor, are the two questions to be solved.

Deeds take effect by delivery, wills by death; deeds, as such, may be executed in the presence of one witness, and without any accompanying words; wills require two witnesses, and a declaration of the testator, at the time, showing his knowledge of the character of the instrument. The instrument in controversy was executed in the presence of a single witness, and with no declaration of its nature or contents. It had all the forms of a deed and none of the forms of a will. It could not, therefore, operate as a testamentary disposition, even if intended, as it certainly was, to take effect after death. It must be good as a deed, or good for nothing; in other words, there must have been a delivery, either in fact or in law, or the signing, sealing, and acknowledging, however strictly complied with, were of no avail.

Was there, then, such a delivery?—not of the house and lot, for that, it is conceded, remained in the actual occupancy of Mr. Astor till his death—but of the instrument of conveyance?

Delivery, where it is not direct to the party named in the instrument, being very much, if not altogether, a matter of intention, must depend upon the state of things existing and the language and occurrences at the time. Now, Mr. Astor, long previously to the date of this deed, had made his will giving the house in question, and the three others adjoining, to the four sisters named, being children of his daughter, Mrs. Lang-

don, for their respective lives, with remainders over to their issue, if any, and if none, to the surviving sisters—with certain powers, also, under certain prescribed restrictions, of leasing, selling, and improving. He subsequently ascertained, from the judicial history of the State, that testamentary " trusts, powers, conditions, limitations, and other dispositions," however " intended in all things to be made conformable to law," were by the courts frequently " deemed invalid." This is shown by the language I have quoted, which was used by him in the codicil made in January, 1838. And he may be supposed, therefore, very naturally, to have desired that, so far at least as his immediate home was concerned, it should be withdrawn from the vortex of *post mortem* litigation. At all events, whatever were his motives, it is certain that on May 1, 1847, Mr. Astor, without the aid of counsel, caused one of his clerks to fill up a printed blank deed for the house and lot in question, in favor of Mrs. Boreel ;—that he signed and sealed the instrument in the presence of the clerk, who became an attesting witness, and handed it to his son, William B. Astor, with directions, in substance, to give it to Mrs. Boreel on his (Mr. Astor's) death ;— that on the third day of the same month it was proved by the attesting witness, and the proof certified by a commissioner of deeds ;—that about two weeks afterwards it was sent by Mr. William B. Astor to the Register's office, and there recorded on the 19th of May ;—and that after the recording it was returned to and retained by Mr. William B. Astor till his father's death, and then handed to Mrs. or Mr. Boreel as her property. From this statement it would seem quite clear that so far as the house and lot in question were concerned, Mr. Astor intended —and that his son understood him as intending—to substitute the deed for the will; to convey the property absolutely and *in presenti*, although for an estate or interest to commence *in futuro*.

The question then is, can a deed be delivered by way of escrow to a third party, to be handed to the grantee upon the happening of an event which is certain to come to pass, and which cannot, in the nature of things, be postponed longer than the continuance of an existing designated life ?

Since the adoption of the Revised Statutes, whatever may have been the old technical difficulties, a freehold estate may be

created to commence at a future day, provided its creation do
not suspend the absolute power of alienation for a longer period
than the "established rules" allow. Mr. Astor, therefore, might
have made a conveyance to his granddaughter, of the house he
lived in, "to have and to hold forever from the day of his death."
Such a conveyance, so expressed in the body of the instrument,
would have been valid and effectual. No simultaneous transfer
of possession would have been necessary. The delivery of the
deed, like the delivery of a bond payable on time, would have
perfected the right immediately, although the actual enjoyment
of the subject of the gift were postponed till the donor's death.
And may not the same end, lawful as it clearly appears, be
attained in a lawful manner. As a general proposition it is not
disputed that a deed, although purporting on its face to be
intended to give immediate possession, may be delivered to a
third party as an escrow; and that its full operation may thus
be suspended, or even defeated by the happening or not hap-
pening of some future event. It is not necessary that the term
escrow should be used. The intention may be indicated in any
other manner. (Gilbert *a.* The North American Fire Insurance
Company, 23 *Wend.*, 43.) Even the putting on record is only
*prima facie* evidence of an absolute delivery to the grantee. It
may be rebutted by proof (Beekman *a.* Frost, 18 *Johns.*, 544),
as it was to some extent in this case by the testimony of Wm.
B. Astor, who in answer to a question whether his father directed
him to have this deed recorded, replied, "he was not sure
whether he did or not—that it would have been done at all
events; it was part of the details of the business of the office."
But Mr. Astor might have directed the recording merely to
preserve the evidence of the deed, without intending an imme-
diate, absolute delivery. Indeed, the testimony is positive, and
twice or three times repeated, that the deed was handed to the
witness with directions "that it was to be delivered to Mrs.
Boreel after his father's death." It was not, therefore, to be
delivered to her before, but it was to be delivered to her at all
events; for death, although future, is certain. Unlike a testa-
mentary disposition the act was irrevocable, even in the donor's
lifetime, without the donee's consent. It was precisely similar
to the case of Goodell *a.* Pierce (2 *Hill*, 659), where the party
handed the deed to the draftsman to keep for the grantee and

to be delivered absolutely on the grantor's death, unless both parties before that event should demand its surrender.

The case of Ruggles *a.* Lawson (13 *Johns.*, 285), was still stronger. There a father made a deed in favor of two of his children, handing it to a third person to be delivered to them after his death, should he die without making a will. The grantor having died intestate and the deed having thereupon been delivered, it was held by the court to be a valid and effectual conveyance, notwithstanding its revocable character in the grantor's lifetime by an act entirely optional with the grantor alone.

This case, although referred to and commented on by the court in Stillwell *a.* Hubbard (20 *Wend.*, 44), was not overruled. It is open no doubt to grave criticism. How an instrument, executed to take effect on the grantor's death, and remaining subject till then to his absolute power of revocation by will, can be distinguished in principle from a testamentary disposition, it is not easy to perceive.

For the present purpose, however, it is sufficient to say that this is not such a case. Mr. Wm. B. Astor held the deed in question subject to no such power. The delivery to him was absolute and irrevocable. It was subject to no condition except the death of the grantor, a condition entirely independent of the grantor's volition; for all men, sooner or later, must die, whether they will or no. That Mr. Wm. B. Astor so understood his father is obvious from his immediately putting the deed on record, an act which, after such a lapse of time, and in the absence of any recollection to the contrary, we may also fairly presume that his father directed. Mr. Astor, it will be recollected, lived nearly a year after the transaction, and was in constant intercourse with his son. If he did not expressly direct the recording, we may fairly infer that he knew of and did not disapprove it. The instrument, too, after its execution and recording, was kept not among Mr. Astor's but among his son's papers, who, although general agent for his father in other business, was in this matter constituted a bailee or depositary, not for his father, but for his father's granddaughter.

Assuming, then, that the deed was intended to be, and that it was, in law and in fact, a valid, operative conveyance, what was the effect of such a donation of the one lot, severally, to Mrs.

Boreel, upon the pre-existing devise of the four lots in common
to her and her three sisters? The natural equity of the case is
obvious enough, as also is the intention of the donor; for, in
addition to the inference almost necessarily resulting from the
act itself, the deed drawn seemingly by Mr. Astor's own dictation,
at the end of the description by metes, bounds, and dimensions,
contains these very significant expressions: "the said lot being
part of the property mentioned in my bequest to the four
daughters of Mrs. Dorothea Langdon." In other words, "hav-
ing given by will to my four granddaughters as tenants in com-
mon in equal and undivided shares, the four adjoining lots, and
those lots being all of equal dimensions and equal value (a fact
admitted on the hearing), I now, so far as Mrs. Boreel is con-
cerned, make a partition of the united interests, and give her by
deed the particular house in question in severalty, leaving the
other three to stand as a bequest to her three sisters." The rela-
tionship of the parties to the donor, and to each other, as well
as the juxtaposition and equality of the lots and their precise
correspondence in number with the number of the donees, place
the correctness of this interpretation of Mr. Astor's purpose, as it
seems to me, beyond dispute.

What then is the legal effect? No will, says the statute,
except in certain specified cases, "nor any part thereof," shall
be revoked "or altered" by any other writing of the testator not
executed with the same testamentary formalities. Among the
excepted cases is that of a deed "by which his estate or interest
in property previously devised or bequeathed is altered, but not
wholly divested," and "in which the intention is declared that
it shall operate as a revocation of such previous devise or be-
quest." (2 *Rev. Stats.*, 64, 65.) And all that the statute
requires is, that the intention to alter the previous disposition
shall appear "in the instrument by which such alteration is
made," not that it shall be declared in any particular words.
If, therefore, it was Mr. Astor's intention, as I think it clearly
was, to substitute as to these lots the deed for the will, and if
that intention, as has also been shown, was sufficiently declared
in the deed, then, independently of the doctrine of election and
within the obvious spirit, if not letter, of the statute above
quoted, the instrument executed in May, 1847, had the legal
effect of altering the previous devise so as to give, absolutely

and beyond recall and without limitation, the one lot in seve-ralty to Mrs. Boreel, and the three remaining lots (subject to revocation) jointly and in a qualified manner to the other three sisters.

The result, then, is, that a decree should be entered declaring that Mrs. Boreel, on the death of her grandfather, in virtue of the deed accepted by her, became the owner in fee simple abso-lute of the lot mentioned in it, to the exclusion, so far as respects that lot, of any interest of her sisters under the will; and that her deed to Mr. Burrows (who sold to Mr. Davis) conveyed a like title to him; and further declaring that the three sisters of Mrs. Boreel, naming them, as a consequence of the execution and delivery to and acceptance by her of the deed in question, instead of continuing as they were, devisees each of one equal undivided fourth part of the four lots, became devisees each of one equal undivided third part of the three lots, in the manner in other respects mentioned in the will; and that the partition, therefore, should be confined to the three lots, and the complaint as to the other be dismissed without costs.

A late case (Jacobs *a.* Alexander, 19 *Barb.*, 243), decided by one branch of the Supreme Court at general term in 1855, be-tween parties somewhat similarly situated, has been cited as bearing on the present. It illustrates but does not determine the questions which have been discussed. Mrs. Bacon, the grantor, an old lady of seventy-four, was very ill, and, as she supposed, about to die. She requested her physician, accord-ingly, to prepare two deeds—one to each of her two daughters. After executing them, she told the doctor to keep them and deliver them on her death; saying, however, at the same time, that if she recovered she intended to retain the right to control the property herself as long as she lived. She did recover, and lived till she was eighty. A few months after her recovery the doctor returned the deeds to her. One of the daughters, after her mother's death, got possession of one of the deeds. The court, nevertheless, held—and I think very properly—that there had been no delivery, that the deed never took effect, and that consequently no title passed.

A like decision had previously been made in this district in a like case. (Roosevelt *a.* Carow, 6 *Barb.*, 190.)