## Therese Wallace v. Susan Harris and others.

*Equity pleading and practice: Partition: Adverse possession: Remedy at law: Equity jurisprudence: Repugnant objections.* The objection made on the argument to the bill in this case, that it is really and substantially one for partition, and cannot be sustained as such, inasmuch as it shows that complainant has been ousted and an adverse possession is asserted and maintained, is not only not identical, but is in a degree repugnant to the objection urged in the answer, that the case made by the bill is one of pure legal cognizance, and accordingly unfit for the consideration of a court of equity.

*Equity jurisprudence: Remedy at law: Partition: Jurisdiction: Waiver.* The reason for remitting to a common-law court a controversy which is only colorably one for partition, but is really designed to try the legal title or right of possession, is one of policy and fitness rather than of any inherent want of power in the court of equity; and a failure to take the specific objection in the court of original jurisdiction will justify an appellate court in treating it as waived, and in declining to consider it when raised for the first time there.

*Equity pleading and practice: Complications: Equity jurisprudence: Remedy at law: Jurisdiction: Partial views.* While the case made by this bill contemplates as chief and eventual relief a severance of common holdings, it embraces several complicated questions that require to be adjusted before the entire controversy can be settled, and some of them are distinctly appropriate to equity; and the fact that some of the cluster of questions involved might, if standing alone, be regularly contested and settled at law, will not be decisive of the jurisdiction where the remedy in equity is fuller and more appropriate; the question of jurisdiction ought not to be rested upon partial views or theories.

*Equity pleading and practice: Objections to bill: Case of equitable cognizance: Concessions by answer.* Defendants are not at liberty to support their objection to the bill as not stating a case of equitable cognizance, upon any assumption that particular alternatives, rather than others which the matter of the bill involves, must certainly prevail; nor can the concession by answer of some of the rights and claims alleged by the bill be urged as impairing the character of the case made by the bill for equitable cognizance.

*Undue influence: Evidence: Adulterous intercourse.* Evidence that parties had lived together in adulterous intercourse is pertinent, as one fact with others, to prove the prevalence of undue influence, but it is doubtful whether, by itself, it ought to be regarded as a sure cause of such influence, or a positive ground of it in respect to property transactions between them; and such a charge ought not to be lightly hazarded, and when once made should be substantiated by very cogent evidence before any weight should be given to it.

*Evidence: Construction of testimony.* It is a maxim that all evidence must be weighed according to the proof which it was in the power of one side to have produced, and in the power of the other to have contradicted; and this maxim is especially applicable to evidence of such a charge as this.

*Voluntary deeds: Consideration.*  As between the grantee and those who claim by inheritance from the grantor in a deed, where no creditor's rights are involved, it is unimportant whether the deed was given as a strictly business transaction to remunerate for or satisfy a distinct and settled obligation, or partly from a desire to reward for long and meritorious service and partly from a desire to testify regard and friendship.

*Undue influence: Evidence: General conclusions of witnesses: Inferences of fact.*  On the subject of undue influence, general conclusions of witnesses, especially if deeply interested, are of no value as evidence in the absence of the particulars; they are scarcely more than inferences of fact drawn from circumstances not disclosed.

*Undue influence: Right to dispose of property: Friendship: Benevolence: Gratitude: Kindred.*  The line between due and undue influence, when drawn, must be with full recognition of the liberty due every true owner to obey the voice of justice, the dictates of friendship, of gratitude and of benevolence, as well as the claims of kindred, and when not hindered by personal incapacity or particular regulations, to dispose of his own property according to his own free choice.

*Deeds: Delivery.*  The delivery of a deed to a third person to be delivered to the grantee after the grantor's death and the delivery thereof by such third person before the grantor's death in breach of the trust imposed upon him, is a sufficient delivery to vest title at the death of the grantor.

*Homestead: Deed by husband alone: Tract including homestead and something more.*  The whole grant is not void because a part of the land described was not grantable; and a deed by the husband alone, of premises embracing a homestead and something besides, is held valid to convey, subject to the wife's dower, so much as is without the homestead right, notwithstanding under our constitution and laws his deed would be void as to the homestead.

*Homestead: Deed by husband: Dower.*  The dower right attaches, so far as the grantee in such a deed is concerned, to the land upon which the deed operates as a conveyance, precisely as if it embraced nothing else, and the homestead parcel included in the description can have no influence upon the extent of the dower right.

*Heard June 15 and 16.     Decided October 12.*

Appeal in Chancery from Wayne Circuit.

*D. C. Holbrook* and *S. T. Douglass,* for complainant.

*William P. Wells* and *G. V. N. Lothrop,* for defendants.

GRAVES, CH. J:

This is an appeal from a decree of dismissal made on pleadings and proofs.

The material matters in the pleadings are as follows: The bill states that for some years prior to September 8, 1871, Charles B. Harris, now deceased, owned in fee simple the west half of the northwest quarter of section seventeen,

in township two south, of range ten east, and that the same was worth ten thousand dollars; that he also owned the southeast quarter of the southwest quarter of section eight in the same township, worth three thousand dollars, and likewise owned other valuable real estate; that he was then, and had been for many years, husband of defendant Susan, but for a long period preceding January 19, 1871, these parties had lived unhappily together, and for a considerable time anterior to the last mentioned date they had resided apart; that during the whole interval he had occupied the first described parcel as the place of his home; that it was improved and provided with a dwelling-house, a barn and suitable out-buildings, and which buildings were situated on a specific twenty acres, and were worth at least two thousand dollars; that Mr. and Mrs. Harris being in such state of disagreement, and actually separated,—she being with relatives,—he, in order to provide support for her and relieve his estate from any claim of dower by her, paid her two hundred dollars and gave his penal bond conditioned to pay her one hundred dollars every six months during her natural life, and at the same time mortgaged said first described parcel to secure such bond; that the bond and mortgage were accepted, and the mortgage placed on record January 19, 1871; that at such date he also conveyed to his son, the defendant Allen T. Harris, the parcel on section eight, with the full concurrence of his wife Susan, and to the end that his son should also pay her an equal sum with that to be paid by himself; that accordingly said Allen T. made his bond and mortgage on the parcel so conveyed to him, to the same effect as the first mentioned bond and mortgage, this last named mortgage being recorded at the same time as the other; that said papers were so made and delivered amicably, and with the advice and assent of the sons and sons-in-law of the parties, and were designed and accepted as a pecuniary provision for said Susan during her natural life, in lieu of dower in the premises, and that the amount secured to her exceeded the value of her dower right in the

real estate of said Charles; that nothing has been paid since the two hundred dollars which was paid at the time of the arrangement, and that said Susan continued to live apart from said Charles until his death; that on the 8th of September, 1871, said Charles executed and delivered to complainant, by the name of Therese Kiley, she being then unmarried, a warranty deed, whereby he conveyed to her in fee and delivered to her possession of said first described parcel; that by said deed he covenanted that the premises were free from all incumbrances, that he was well seized and had good right to convey; that she caused the deed to be recorded, and that on the 18th of September, 1871, or about ten days later, said Charles B. Harris died testate, and by his will disposed of such real and personal estate as remained to him, by devising it to all his children; that the will was admitted to probate in the probate court, but an appeal was taken to the circuit court from the decision of the probate court thereon; that for years before the death of Mr. Harris, complainant had been an inmate of his family, and was so at his decease, and at that time, and on the happening of that event, she was in the exclusive possession and in the sole control of the land so deeded to her as before mentioned; that shortly after such decease the defendant Susan, the widow of said Charles, and his sons and daughters, intruded into the possession and into the dwelling-house, and compelled complainant to leave, and in fact forcibly expelled her, and seized the possession, and thereafter kept it and continued to hold it.

The bill then charges that defendants insist that her deed is void because it assumed to convey the homestead; and that, if not void as to all, it is so as to the forty acres containing the buildings; that they further insist that the bond and mortgage on the land conveyed to her are valid, and that the mortgagee has full right to collect the money therein provided to be paid; that the defendant Susan, the widow, has dower right and the right to hold possession; and that, in case the deed is held void only as to the home-

stead part, on account of its including the homestead, then
the dower right entitles her to have dower assigned in
some portion other than that embraced by the homestead;
that said homestead includes forty acres, and that dower
must be assigned in one-third of the residue : whereas com-
plainant alleges that the widow is not entitled to retain the
mortgage and also have dower in such premises; that she
ought to elect one to the exclusion of the other; that no
part of the premises constituted a homestead; but, if otherwise,
then that no part exceeding in value fifteen hundred dollars
can be held, and that the deed cannot be invalidated as to
any portion beyond; that if the widow is found to be enti-
tled to dower, she can only be endowed of one-third the
value of the whole parcel, and the adjustment must depend
on an estimate and appraisal.

It is then alleged that the premises, being in dispute,
are allowed to go to waste and are becoming greatly injured,
and that the widow, claiming to hold her dower right and
her right as mortgagee also, threatens to foreclose and col-
lect the money mentioned in the mortgage; that the rights
of all parties cannot be decided until the widow makes her
election, and until it is ascertained whether a homestead
right exists, and what part and portion of the premises, if
any, is required to be set off as a homestead, and what, if
any, as dower. It is then further charged that the defend-
ants, or some of them, insist that the deed to complainant
was fraudulently obtained and should be set aside, and that
the whole of the premises belong to them; that the last
will of Mr. Harris is void for various reasons, and that each
defendant is entitled to an equal or some other share or
part of all of said premises; and complainant alleges that
until the same is determined, the rights of all are disputed,
and the premises rendered useless.

A sworn answer was waived, and special and general
relief prayed. The bill was filed in the winter of 1872.

The defendants answered jointly. They admitted that
Charles B. Harris owned the west half of the northwest

quarter of seventeen, but denied it was worth ten thousand dollars. They further admitted the west half of the southwest quarter of eight was owned by him, and not merely one half of the lot, and that it was worth six thousand dollars. They admitted his relationship to the defendant Susan, that for some time anterior to January 10th, 1871, the parties had lived unhappily together, but averred such unhappiness was caused by the unkindness and misconduct of Mr. Harris. The answer then says, that at this last named date, and for about two years preceding, Mr. and Mrs. Harris lived apart, and that he resided all the while on the before mentioned portion of seventeen; that such place had been occupied by them as their homestead until the separation, and continued thereafter to be so occupied by him until his death; they admit the condition of the premises to be as set forth in the bill, but allege that the buildings are on the north forty, and deny that they are of the value of two thousand dollars. They further say, that about six years before defendant Susan went away from the abode, her late husband, the said Charles, brought complainant there, and she began to reside in the household as a servant of the family; that not long afterwards the said Charles B. began to treat his said wife Susan unkindly, and continued *his ill-treatment and unkindness* until she was compelled to go away, and seek refuge and a home with a son-in-law; that such *ill-treatment and unkindness consisted in his withholding necessary food from her, and in using violent and abusive language to her, and excluding her from her own and other rooms in the house where she had a right to be, and in neglecting to bestow the necessary care and attention due to one of her age and position in the household; that this continued constantly, and was personally participated in by complainant, and that she aided and abetted said Charles in his misconduct;* that after staying with her son-in-law about six months, she, believing it right and proper, and her privilege to have a home in the family mansion, returned to it, and thereupon the abusive treatment was im-

mediately resumed and continued, until at length said Charles inflicted personal violence upon her, and locked her in a room to keep her from communicating with her relatives; that she succeeded in making communication, and being in fear of her life from the violence of her husband and complainant, she again went to her son-in-law, and there staid until just before the death of said Charles.

The defendants then say, that under these circumstances the bonds and mortgages in the bill mentioned were made, and the sum of two hundred dollars paid; but they insist that these matters were exclusively intended to provide and secure support for said Susan, and were neither given nor received to relieve the estate of the husband from the wife's dower right. They also deny that said Susan concurred in the concoction of the bond and mortgage from Allen T. Harris, except in so far as such securities were made and received to provide her support, and as something necessary in consequence of her being driven from her home. They admit the sons and sons-in-law assented to the making of the bonds and mortgages, but only because it was needful as a means of support for the old lady, inasmuch as she had been expelled from the house; and they deny that the sums secured exceeded the value of the dower of said Susan in the real estate of her said husband. They admit she continued to live apart after January 19th, 1871, but allege that just before his death she returned, and was present when he died, and was at that time living in their common homestead as his wife. They admit that on the 8th of September, 1871, said Charles B. made and executed to complainant, by the name of Therese Kiley, a warranty deed which purported to convey to her in fee the said west half of the northwest quarter of section seventeen, and that said deed contained the covenants specified in the bill, and was recorded as alleged; but they expressly deny that said Harris delivered said deed to complainant, and aver that it was delivered in escrow, to one Alexander Collar, to be delivered to complainant after the death of said Harris; and further

aver that said Collar made delivery to complainant before
the happening of such event, and that it was thus wrong-
fully delivered to complainant, and they hence insist that
such delivery was unlawful and void.     They further deny
that said Charles B. delivered possession of the premises to
complainant, and deny that she was unmarried when the
deed was so made and executed.     They admit that said
Charles B. died on the 19th of September, 1871, leaving
said Susan, his widow, Allen T. and George L., his sons,
Eliza Ann Brainard and Althea Hale, his daughters, him
surviving, and that he left a last will, disposing of his real
and personal estate; but they deny that the bill correctly
sets forth its provisions.     They admit the probate and ap-
peal, and likewise admit that for some years preceding the
death of said Charles B. the complainant was a member of
his family, and was in his house when he died; but they
deny that she was in sole and actual possession and control
of the lot on section seventeen, and aver that she was there
when he died, merely as his servant, and that she had no
possession of any part of the house or premises.     They fur-
ther deny the intrusion and expulsion mentioned in the bill,
and aver that when said Charles B. died, his said wife Su-
san was present in the dwelling-house, and on his ceasing
to live was in possession asserting her homestead and widow-
hood rights, and that the other defendants, in character of
heirs at law, were in possession, subject to the homestead
and widowhood rights.     They admit that said Susan and
the other defendants now have and hold possession of the
whole premises; and that they claim the deed from said
Charles to complainant to be wholly void, even if lawfully
delivered:     *first,* because it undertakes to work a disposal
of the homestead during the wife's life, without her signa-
ture; and *second,* because it was induced by the fraudulent
procurement of complainant, and by undue influence over the
grantor; that is to say, that said Charles B. and complain-
ant, after she went into the family as servant, became im-
properly intimate; that an adulterous and criminal connec-

tion was established between them, and by means thereof
complainant acquired an undue influence over said Charles
B.; that she submitted to his wishes, with the purpose and
intent to acquire influence, and to obtain transfers of his
property; that she came to have such power over him as
to exercise control over his business and farm matters; that
shortly before his death, and for a period covering the giv-
ing of the deed, he became and was much weakened by
disease, was under the influence of medicines, and his mind
rendered more subject to the dominion of complainant; that
she excluded others, including his relatives, from communi-
cating with him; that he did not understand the effect of
his acts, and was incompetent to execute a deed with full
understanding of its nature, and that there was no consid-
eration for the conveyance in question; *third*, that if this
deed to complainant is not wholly void for any purpose, and
as to all of its provisions, then, it is insisted, that it was and
is so as to the whole forty acres containing the build-
ings, being the westerly forty acres of said west half of the
northwest quarter of seventeen, and the value whereof it is
averred does not exceed fifteen hundred dollars.

The defendants then deny that they claim that said Susan
is entitled to the benefit of the bond and mortgage given
by said Charles, and also to dower in the west half of the
northwest quarter of seventeen, and admit that she ought to
elect between them; and said Susan, answering for herself,
declares her election to have dower in the lands of the
said Charles B., and expressly consents that the bond and
mortgage be canceled. It is next insisted that said Susan
is entitled to hold a homestead in the forty acres containing
the buildings, and to have dower in the residue, and further,
that the deed ought to be declared fraudulent and void, and
be set aside. They also insist that said Susan is entitled
to remain in possession under her homestead and widowhood
rights, and that the other defendants are entitled to hold
subject thereto, in their character of heirs. They deny
the charges of waste and injury, and deny that said Susan

threatens to foreclose the mortgage. They finally insist that the matters in the bill are purely such as are cognizable in a court of common law, and hence are improper for a court of equity.

This statement is no doubt tedious, but it has seemed best to make a clear exhibit of the positions taken by the parties, and to achieve that object, a very full abridgment of the pleadings appeared unavoidable.

The defendants' counsel, on the hearing in this court, maintained at the outset that the proceeding by complainant is really and substantially one for partition, and that on its face it is not sustainable as one of that character; and the reasons stated are, that complainant alleges she is not in possession, but has been ousted, and that an adverse possession has been and is asserted and maintained, and that her claim of right is denied and resisted.

There is no allegation in the answer to this particular effect, and so far as the pleadings or other matters in the case afford indication of defendants' position in the court below, we are not warranted in assuming that this precise point has been previously made.

The objection made in the answer against tolerating the bill is, that the case stated in it is one of pure legal cognizance, and is accordingly unfit for the consideration of a court of equity. The distinction between these positions is quite obvious. They are not only not identical in their nature, but are in a degree repugnant.

If the case, as complainant states it, is one positively and simply for partition, it cannot be one of exclusive legal cognizance.

Whether, when sitting as an appellate tribunal, and after final decree below on the merits, the court ought now to give way to such an objection urged for the first time, may be questioned, unless, indeed, the point is one necessarily fatal whenever and wherever raised.

When the cause is only colorably one for partition, and the true end and purpose is evidently to obtain a determina-

tion of rights respecting title and possession which are purely legal, and no matters appear to create obstacles to a full, fair and final disposal of the controversy in a court of common law, there is solid ground for claiming that the litigation ought to be carried on in such a tribunal. But the reason for remitting the investigation to a common-law court is one of policy and fitness, rather than of any inherent want of power in a court of equity; and hence, if chancery decides, and there is no reversal in a proceeding directed to that end, the result is not void, but must stand and be respected. As a consequence of these considerations, there is much reason for saying that a failure to take the specific objection in the court of original jurisdiction may well justify the appellate court in treating it as waived, and in declining to pursue a course fraught with delay and cost and no inconsiderable hardship to some, if not to all the parties contending.

There can be no doubt but that the case made by the bill contemplates as chief and eventual relief a severance of common holdings; but this is not the sole matter to be settled. There are several subjects of importance bound up with it. Before any severance can be ordered, a cluster of serious questions are presented for adjustment, and among them we have some which involve considerations quite within the province of equity. Taken as a whole, as it should be, the cause is complicated, and it is indispensable to a just and complete adjustment of the entire controversy, that the complications be cleared up, and to this the functions of a court of common law are inadequate. Whether in any eventuality there should be partition, depends upon the solution of questions some of which are very distinctly appropriate to equity, and the partition itself, if called for as a consequence of the answers which those questions may receive, is of course proper to such a court.

The circumstance that some of these questions, if standing by themselves, might be regularly contested and settled in an ejectment, is not enough. The whole case, with all

its concomitants, together with the nature and incidents of partition, in view of the character of the holdings and the remedial benefits to which parties are entitled, must have attention; and we are to inquire whether a remedy at law would be appropriate and effectual on the one hand, and whether any obstructions exist to a valid defense at law on the other.—*1 Spence, 699.*

If the remedy in equity is seen to be fuller or more appropriate, if better adapted in view of the ingredients of the controversy to effectuate justice as between the litigants, and put an end to disputes about the subject of contention, the power over the case ought not to be questioned upon partial views or theories. It may be safely assumed that a court of equity is as competent to deal rightly with causes as a court of common law, and that the interests of parties will be as carefully guarded by a judge sitting in chancery, as they would be if the same judge were sitting on the law side.

Where the question is strictly jurisdictional, and where the proof is specifically suited to the arbitrament of a jury, and also in those cases which are susceptible of being fully and justly disposed of in a court of law, and which inveterate usage has assigned to that jurisdiction, we may find reason enough in principle and convenience for adhering to the established course. But where, as in this state, the same judges hold both courts, there can be no reason for great nicety.

The great purpose is to terminate the whole controversy and reach justice through means the most appropriate. And "when the principles of law by which the ordinary courts are guided give rights, but the powers of those courts are not sufficient to afford a complete remedy, or their modes of proceeding are inadequate," it is in general admitted that a court of equity may act.—*Mitford, 111, 121, 122, and notes; Willard's Eq., Tit. "Dower," "Partition;" Story Eq., §§ 650, 651, 656, 656b, 658, 632; 1 Spence, 639, 653; 2 Ib., § 11, and notes; Comp. L., §§*

*6369, 5057; Brady v. McCosker, 1 Com., 214; Thayer
v. Lane, Har. Ch., 247; Wheeler v. Clinton Canal Bank,
Ib., 449; American Ins. Co. v. Fisk, 1 Paige, 90; Whit-
lock v. Duffield, 2 Ed. Ch., 366; Quick v. Stuyvesant, 2
Paige, 84; Mallory v. Vanderheyden, 3 Barb. Ch., 9;
Pratt v. Northam, 5 Mason, 95; Pierpont v. Fowle, 2
Wood. & M., 23; Weymouth v. Boyer, 1 Ves. Jr., 416;
Baxter v. Knollys, 1 Ves. Sen., 494; Truman v. Lore,
14 Ohio St., 144; Clary v. Clary, 2 Ired., 85; Hartshorn
v. Day, 19 How., 223.*

The defendants are not at liberty to support their objec-
tion upon an assumption that particular alternatives, rather
than others which the matter of the bill involves, must cer-
tainly prevail.     Nor can the objection fairly derive support
from the circumstance that the answer, yielding to an asserted
equity in the bill, declared an election between the right to
dower and the right to retain the mortgage security, and
renounced the latter.     The concession by answer of rights
and claims alleged in the bill cannot be urged as impairing
the character of the case made by the bill for equitable
cognizance.     Neither the theory of the bill or of the answer
contemplated that any extreme pretension on the one side or
the other must necessarily prevail.     On the contrary, both
sides foresaw that it might turn out that the judgment of
the court would have to be graduated by an abatement of
some portion of the claims set up on each side, and that
an adjustment would require the plastic action of equity.
One of the defendants was in fact mortgagee, and a portion
of the mortgage debt was past due and unpaid.     She was
in possession.     A homestead right was in question, and if
well based, then its precise constituents as to buildings, and
its territorial extent, were undefined and uncertain.     The
existence and extent of a dower right were also involved.     The
commission, or at least the permission of waste was charged.
There was appearance of loading the land with double and
inconsistent burdens in favor of the defendant Susan, and
giving rise to an equity to put her to an election.—*Lacy v.*

*Anderson* and *Rose v. Reynolds,* cited by *Mr. Swanston,* in note to *1 Swanston, 397.* And amongst all the rest there was the claim of defendant, which might or might not be sustained, that the deed on which the whole right of complainant rested was procured by her fraud and undue influence.—*Shirley v. Ayres, 14 Ohio (Griswold), 307.*

Surely, we think the case presents such complications, such obstacles to a disposition at law, such questions peculiar to equity, as to make it manifest that a court of law could not so deal with it as to effectuate a proper adjustment, and bring about a complete termination of the contention, and that a speedy, full and just solution could be had only in a court of equity.

In *Hoffman v. Beard, 22 Mich., 59,* a majority of the court thought the real questions involved were purely legal, and such as were quite within the competency of a court of law to definitely settle; and moreover, that by the general doctrine regulating the distribution of subjects of litigation between the two jurisdictions, the particular case, as shaped on the record, belonged to a court of common law.

The majority of the court were unable to see any ingredients in the case to warrant its diversion to equity, or any reason for ignoring what were understood as established distinctions between the courts. The case is obviously distinguishable from this in respect to those elements upon which the question turns.

The next ground of defense is, that the deed to complainant was obtained by undue influence exerted by her over Mr. Harris, and this is founded on two classes of facts; the existence of the facts of one class being uncontroverted, but those of the other disputed. The central fact in the latter class, and indeed the main and chiefly influential fact to afford a basis for this defense is, that the complainant was the mistress of Mr. Harris, and living with him in adulterous intercourse. A charge so dark and criminal ought not to be lightly hazarded, and when once made it should be substantiated by very cogent evidence. Unless sustained

by clear and satisfactory proof it should be dismissed without hesitation.

I entertain no doubt but it would be pertinent to show the existence of such a relation, as one fact with others to prove the prevalence of undue influence. But whether by itself it ought to be regarded as a sure cause of such influence, or a positive ground of it in respect to property transactions between the parties, is a very different question, and one which the needs of this case do not require to be answered. Because, in the first place, there are some other circumstances which if the main one were true might afford some though not much help in making out the defense, and in the second place, the proofs do not convince us that the alleged criminal relation existed.

*Lord Mansfield* forcibly observed in *Blatch v. Archer,* that "it is certainly a maxim that all evidence is to be weighed according to the proof which it was in the power of one side to have produced, and in the power of the other to have contradicted."—*Cowper, 63, 65.*

Now, if it is true as claimed, that these persons were for years living at his homestead in such unlawful relation, there must, in view of the circumstances about them, have been means of proving it beyond reasonable question. Reputable persons in the vicinity, and having no interest on one side or the other, must have known it, and amongst the great number of individuals at various times employed on the place there must have been some of good credit and able to detail particulars intrinsically probable. The old lady herself, even in view of the nature of the alleged relation as represented by defendants themselves, and in view of her opportunities, and the state of things in the household as the defendants suggest them, must have had many chances for observing very evident signs of the intimacy if it existed as charged; and yet, although she was questioned in regard to various acts of personal cruelty committed against her by her husband and complainant, and seems to have felt no sort of delicacy or reserve in deposing to such misconduct, she was not ques-

tioned at all, either directly or indirectly, in regard to the other and more serious misconduct, neither, indeed, does she even hint in her evidence at the existence of it.

The testimony of the daughter-in-law is quite remarkable. According to her own account she discovered her aged father-in-law and complainant in the very fact, and yet for years afterwards frequented the house as though nothing had happened, and even kept on terms of intimacy with complainant until the beginning of the contention about the property after the death of Mr. Harris. In the absence of a state of facts to explain this anomalous conduct, or able to reconcile what would seem to be moral opposites, it appears difficult to regard such evidence as of any force to convict the deceased father-in-law of the shameful offense imputed. Her husband's evidence on the point in question is so intrinsically weak as to be without weight. When carefully examined it will be seen to be vague, inferential and indeterminate. There are, besides, some exterior considerations which operate against its convincing value. The incidents related by Mead and Roberts are very improbable in themselves, and we should have to feel great confidence in the candor and truthfulness of the witnesses before giving credence to their statements. And after gathering what we can from the record in regard to these witnesses, their attitude in the cause and the connection between one of them and the defendants, we are unable to put trust in their relations.

The age and conceded physical infirmity of Mr. Harris and the youth of complainant certainly do not favor the charge; on the contrary they weigh against it. On the whole we repeat that this feature of the defense does not appear to us to be sustained, and it must therefore be dismissed.

The case affords no ground for saying that Mr. Harris had not sufficient mind and power of will to make the conveyance. The evidence on all sides is full to show that his

will was very firm, and there is certainly nothing whatever to impugn his mental ability to make valid transfers.

Rejecting the charge that he lived on illicit terms with complainant, is there any satisfactory proof that she had acquired any such dominion over him as the defense claims? We are not sure that this is insisted on; but suppose it to be otherwise, the nature of the conveyance itself neither implies any thing of the kind nor leads the mind that way. He understood distinctly what he was doing, and seems to have had a fixed purpose to bestow a part of his property on complainant, and I do not conceive it to be important, as between these parties, whether the matter was a strictly business one, wherein he undertook to remunerate for or satisfy a distinct and settled obligation, or whether he was moved to do what he did, partly by a desire to reward for long and meritorious service, and partly by a desire to testify regard and friendship. The latter view is perhaps upon the whole the most reasonable. For many years the complainant seems to have been the stay of his home and a faithful assistant, and we have no evidence of her having been compensated as a hired servant. It was natural for him to feel like making some handsome provision for her. But whichever was the motive, he was lawfully entitled to act upon it, if in a situation to decide and act as a free moral agent. There were no creditors to be hurt.

The complainant had been with him from her early girlhood, and however blamable he may have been for the relations existing between himself and his wife and children, the fact is, that in his old age she was the only one able and willing to have the care and management of the household and afford a home.

That she should be much trusted and have a good degree of oversight was practically unavoidable.

The assistance required of her, or given by her, so far as we have trustworthy light, was not such as to raise an inference that she either drove, cajoled or led Mr. Harris.

WALLACE *v.* HARRIS.

Indeed, upon the whole case, it would be hard to say that she had as much influence or power over him as he over her.

Some witnesses, it is true, speak in general terms of her having the management of affairs and of exerting control over him; but such proof is of no value without particulars. General conclusions of witnesses in such a case and on such a point may or may not be warranted, and unless we are furnished with *data* we cannot say whether they are warranted or not. They are scarcely more than inferences of fact drawn from circumstances not disclosed. Besides, two of the three witnesses who thus depose are deeply interested against complainant, and the third is a niece of the defendant Susan, and exhibits a decided bias.

Some caution is needed in cases of this kind lest through an improper application of the salutary doctrine invoked we do not sacrifice one of the most sacred rights of property.

The line between due and undue influence, when drawn, must be with full recognition of the liberty due every true owner to obey the voice of justice, the dictates of friendship, of gratitude and of benevolence, as well as the claims of kindred, and when not hindered by personal incapacity or particular regulations, to dispose of his own property according to his own free choice.

In the course of this examination we have not failed to regard the various circumstances mentioned at the bar as tending to support this part of the defense. We have noticed the provisions of the will and the particulars connected with the delivery of the deed supposed to have some bearing. An express mention of every item would greatly and needlessly expand this opinion. It remains to say, on this head of the defense, that we cannot say that the act of Mr. Harris in deeding to complainant was marked by undue influence. On the contrary, it appears that he was his own man in the transaction.

An objection was raised by the answer against the validity of the deed growing out of the mode of delivery. It alleges

that the grantor passed it to Doctor Collar to be by him passed over to complainant after the grantor's death, and then insisted that Doctor Collar, instead of waiting for the event which was certain to happen, and on the occurrence of which he was to hand the deed over, violated his trust and gave the deed to complainant before the event. And the answer then averred that this breach of his trust by Doctor Collar vitiated the grant.

We understand the defendants as now waiving all question as to the sufficiency of the delivery to vest title, and we are therefore not called on to dwell on the force and effect of this portion of the answer, or to pass by it and examine the depositions as the fact of delivery. Nevertheless, it may not be amiss to cite a few authorities as to the legal effect of the transaction as it stands explained and admitted in the answer.—2 Wash. R. P., 584, and cases; Perkins, 143, 144, 145; 4 Kent's Com., 454, 455; Shep. Touch., 58, 59; Wheelright v. Wheelright, 2 Mass., 447; Foster v. Mansfield, 3 Met., 412; O'Kelly v. O'Kelly, 8 Met., 436; Belden v. Carter, 4 Day, 66; Stewart v. Stewart, 5 Conn., 317; Ruggles v. Lawson, 13 J. R., 285; Tooley v. Dibble, 2 Hill, 641; Goodell v. Pierce, Ib., 659; Nottbeck v. Wilks, 4 Abb. Pr., 315; Jacobs v. Alexander, 19 Barb., 243; Jackson v. Dunlap, 1 J. Cas., 114, and note; Hunter v. Hunter, 17 Barb., 25; Hathaway v. Payne, 34 N. Y., 92; Stewart v. Weed, 11 Ind., 92; Bushell v. Pasmore, 6 Mod., 217; Butler & Baker's case, 3 Coke, 26 b, 27 a; Perryman's case, 5 Coke, 84 b; Shirley v. Ayres, 14 Ohio (Griswold), 307; Shaw v. Hayward, 7 Cush., 170; Parker v. Dustin, 2 Foster, 424.

We next come to an objection that the deed was wholly void because the single and entire tract it assumed to convey embraced the grantor's homestead; and this objection is based upon the nature of the proceeding and the language of the constitution.

The constitution describes what shall be exempted as a homestead and then declares that "such exemption shall not

extend to any mortgage thereon lawfully obtained; but such mortgage or other alienation of such land by the owner thereof, if a married man, shall not be valid without the signature of the wife to the same."—*Art. XVI.*, § 2.

The parcel which the deed described was one entire eighty acre lot; the grantor was a married man; his wife's signature was not obtained.   Still the home of the parties was upon the lot, and there seems to be no room for saying that this home was not a "homestead" within the meaning of the constitution.   The lot, then, contained land covered by the homestead right and land not covered by it.

In view of the value of the land and buildings, the portion appropriate to the homestead right and covered by it was less than forty acres, and since its area depended on valuation, its boundaries were unascertained, and could only be determined by regular appraisal and marking.   This would be a proper proceeding for a court of equity.

In *Dye v. Mann, 10 Mich., 291*, it was considered that a conveyance by the husband alone could not be held valid as to any interest whatever in the specific parcel covered by the homestead right, though that right is not in itself perpetual.   At the same time, however, it was decided that the grant was not invalid as to land without the boundary of the parcel affected by the homestead right.

As the opinion in this case was somewhat criticised at the bar, a few words on the subject may not be out of place.

Unless precluded by the constitution, or some statute or principle of law, it was certainly within the power of Mr. Harris to deed away his own land.   He was precluded from deeding so much as belonged to the homestead without his wife's signature, and he was precluded from deeding the residue of the lot, except subject to her right of dower, unless she joined.   Neither the constitution nor any statute fettered his power to transfer by his sole deed such residue subject to her dower right.   The constitution merely makes void the alienation of the land constituting the homestead,

and not the alienation of other land.—*Art. XVI.*, § *2.* And the statutes, instead of making void the sole deed of a married man of land owned by him and not affected by a homestead right, recognize his power to give such a deed. Is there any principle which renders a whole deed void because it assumes to grant an entire parcel, and some portion of the parcel is not grantable on account of the existence of a homestead right, and the rest is grantable? We do not think so.

We venture to refer to two or three cases which seem pertinent.

By certain laws of North Carolina all entries, surveys and grants of land within the Indian territory, which is now a part of Tennessee, were unlawful. An entire grant was made, and the beginning corner and part of the tract was outside of the Indian territory, but the rest of such single tract was within it, and the court decided that the grant was valid as to so much as was outside, and invalid as to the residue.—*Danforth v. Wear, 9 Wheat., 673.*

Afterwards a like question arose upon a grant of an entire tract, situated partly in the Indian country and partly outside of it, and all within the limits of the state of Georgia, and chief justice Marshall in giving the opinion of the court in favor of holding the grant valid as to the portion not within the Indian country, among other remarks, made these apposite observations: "But is the whole grant a nullity because it contains some lands not grantable? In the nature of the thing we perceive no reason why the grant should not be good for land which it might lawfully pass, and void as to that part of the tract for the granting of which the office had not been opened. It is every day's practice to make grants for lands which have in fact been granted to others. It has never been suggested that the whole grant is void because a part of the land was not grantable." Again, he observed: "There is a plain difference between a grant comprehending lands which may, with lands which may not be granted, and one made on a fraudulent misrep-

resentation or illegal consideration which extends to and vitiates the whole instrument."—*Patterson v. Jenks, 2 Pet., 216.*  The same principle was repeated and applied in *Winn v. Patterson, 9 Pet., 663.*

The circumstance that the line of division is not in fact marked, makes no difference in principle.  It is part of the object of this suit to have it marked, and we perceive no difficulty in the way.  All the elements required are understood, and the court has power to attain the end.  We are consequently of opinion that the deed was void as to the homestead parcel, whatever its limits, and valid as to the remaining land on the lot; and of course there can be no question as to the widow's right of dower in such residue.

She did not join in the deed, and in answer to the call made by the bill she has elected to take her dower, and has renounced the provision secured by the bond and mortgage, and there is no pretense of any other ground for excluding her right.  But such right of dower attaches, so far as complainant is concerned, to the land the latter gets by the deed. The homestead parcel is blotted out of the deed, and it has no more influence upon the extent of the dower right than if the deed had not contained it.

The execution of the deed preceded Mr. Harris' death by so short a time that it can make little or no consequential difference in this case whether the complete delivery and vesting of title is referred to the date of his death, or the few days earlier when complainant alleges the delivery to have occurred, and hence it is not important now to ascertain about this.  I think it may be safely held, after the admission in the answer, that at all events the delivery was perfect on the occurrence of Mr. Harris' death.  Adopting that time, then, the valuations for ascertaining the extent of the homestead and of the dower right will have reference thereto.

The decree below must be reversed, and one entered in this court, declaring a homestead right in the land embraced by the deed, and to be defined and set apart, and declaring

the deed invalid as to so much of the lot assumed to be conveyed by the deed as such homestead right covers, and valid as to the residue of the lot, though subject to the dower of the defendant Susan in such residue, and such dower therein to be ascertained and admeasured and set apart, and further declaring the bond and mortgage from Charles B. Harris to the defendant Susan to be of no effect, and ordering the cancellation thereof, and providing for putting complainant in possession of that part of the lot outside the limits of the homestead parcel and not included in the portion set apart for dower.

The complainant will recover her costs in this court and in the court below, and the cause will be remanded for further proceedings.

The other Justices concurred.