### QUICK vs. STUYVESANT.

Where one person conveyed land to another for the purpose of opening a street in the city of New-York, and there was no other consideration for the conveyance but the benefit which the grantor was to derive from the opening of the street, and by subsequent events beyond the control of both parties the street could not be opened a re-conveyance of the land was decreed.

If a deed or obligation is sought to be enforced in an event not forseen or provided for by the parties, and contrary to the original intention, a court of equity will interfere to prevent such injustice.

In such a case the court of chancery will direct that to be done which the parties would themselves have directed had they forseen the event.

Where from any defect of the common law, want of foresight of the parties, or other mistake or accident, there would be a failure of justice, it is the duty of a court of equity to supply the defect or furnish the remedy.

But these principles, when acted on by the court of chancery, are subject to such limitations and restrictions are necessary to protect the rights of bona fide purchasers and others who have superior equities.

In 1797, J. Quick owned a strip of land in the city of New-York, on the east side of the Bowery Lane, about 400 feet in length on the Bowery, and extending back 66 feet at the north end and 120 feet at the south. P. Stuyvesant, the father of the defendant, owned the Bowery farm, lying north and east of Quick's land, and extending back to the East River. In order to lay out this farm into city lots, by streets running through it in different directions, Stuyvesant made an arrangement with Quick, by which the latter consented to have Quick-street run through the middle of his lot and the Bowery farm, from the Bowery Lane to the East River, and to have Rensselaer-street run parallel therewith, taking a small part of the south end of Quick's lot. Quick was to have two small pieces of the Bowery farm on Quick-street in rear of his lot, and was to give Stuyvesant a small piece of his lot at the north end fronting on the Bowery Lane, and another small piece in the rear of the south end, bound-

ed southerly by Rensselaer-street. By this arrangement Quick would have three corner lots on the Bowery Lane and on Quick and Van Rensselaer-streets, and would obtain a lot in the rear of his land, fronting on Quick-street, in lieu of the land which was to be taken for the streets, and that which was relinquished to Stuyvesant at the north end. For the purpose of carrying this arrangement into effect, a diagram was made showing the location of the contemplated streets, and dividing the whole land into building lots, which were marked and numbered on the map. Quick then conveyed the whole of his land to Stuyvesant, and the latter immediately re-conveyed to him the several lots which were intended to be retained by him, and also the additional lot in the rear, fronting on Quick-street. In 1805, P. Stuyvesant died, and by his will he devised the property in question and the whole of the Bowery farm to the defendant in fee. Before the streets were opened, the act of the 3d of April, 1807, (sess. 30, ch. 115,) was passed, which prevented their being opened as contemplated by the parties. Under this act the commissioners laid out the third avenue, which left the Bowery a little south of Quick-street, and took off about one half of the three lots of Quick north of that street. The commissioners also laid out Fifth-street, which leaves the Bowery Lane precisely where Quick-street did, but running in a more southerly direction to the East River, takes off about one half of the two lots fronting on the Bowery south of Quick-street, and about two thirds of the lot immediately in rear thereof. They also laid out Fourth-street, which commenced at that part of the Bowery where Rensselaer-street did, and runs parallel with Fifth-street.

In 1815 J. Quick died intestate, leaving the complainant and his brothers, William and Abraham Quick, his heirs at law. In 1816 the three brothers made partition between themselves of the lands of their father; in which partition all the land north of Fifth-street was conveyed to William, the middle part south of Fifth-street was conveyed to the complainant, and the southerly part to Abraham, including the land which was originally intended to be covered by Rensselaer-street. In 1826 Abraham

1830.

Quick
v. e
Stuyv sant.

conveyed his share to the complainant. In 1824 the defendant and the heirs of William Quick compromised as to the claim made of the land originally intended for Quick-street which is not included in Fifth-street; and mutual releases were executed in pursuance of that arrangement. In 1827 Fourth-street was opened, and the same year the complainant erected a dwelling house at the corner of Fourth-street and the Bowery, upon land formerly owned by J. Quick, part of which was the land originally intended for Rensselaer-street. While the complainant was erecting his house, the defendant forbid his building on that part of the land which was originally intended to be included in Rensselear-street, and finally commenced an ejectment suit to recover possession thereof. The complainant thereupon filed his bill in this cause for an injunction, and to obtain a re-conveyance of that part of the premises. The cause was submitted on pleadings and proofs.

*J. Platt*, for the complainant. From the facts in this case it appears, that Peter Stuyvesart and Jacobus Quick made an agreement and adopted a plan for laying out streets in a particular manner which suited their interest: and that the government then interposed and broke up their arrangement, and prohibited forever the streets which they had so designed and agreed on. The agreement was in fieri, when the hand of government was laid upon it. By that act of the government, and not by any act or default of his own, Quick lost the benefit of the contemplated streets; and it is contended on the part of the complainant, that equity requires a recon-veyance of the ground which was conveyed to Petrus Stuy-vesant, for a consideration which has failed.

Agreements not fraudulent " will be relieved against on the ground of inequality, an imposed burden or hardship on one party to a contract, which is considered a distinct head of equity, being looked upon as an offence against morality and as unconscientious." (2 Powell on Con. 145, 146.) In this case there was no fraud imputable to Mr. Stuyvesant; but it was evidently an unequal bargain according to the le-

1830.

Quick
v.
Stuyvesant.

gal rights of the parties; and the defendant now makes an unconscientious use of it, in an event not contemplated by the contracting parties. "In every well constituted government there is somewhere lodged a power of supplying that which is derective, and controlling that which is unintentionally harsh in the application of any general rule to a particular case." (1 Fonbl. Eq. 6, note c.) "Where there would be a failure of justice by the rules of conscience, equity is bound to interpose and supply the defects of the law." (Grounds and rudiments of Equity, page 75.) So "equity will relieve against one's own act according to circumstances." (id. 96.) "Courts of equity, not suffering a right to be without a remedy, interfere in all cases in which the right is clear, but from want of particular evidence is unavailable at law." (1 Fonbl. Eq. 154, note f.) In *Newton* v. *Rouse*, (1 Vern. 460,) it was decreed that 100 guineas, pait of an apprentice's fee, be paid back to the father of the apprentice, his master having died within three weeks after sealing the articles. The case of *Underwood* v. *Stuyvesant*, (19 John. R. 181,) contains no principle adverse to the equitable claim of Quick. The court there say, "the casus fœderis has not occurred, and the parties are mutually absolved from their contract in relation to the streets," &c.

The original agreement was, that the ground marked on the maps for Quick-street and Rensselaer-street, should be devoted as streets; and the conveyances between the parties were designed to carry that object into effect. The legislative power which has been exerted over the subject, could not be foreseen by the contracting parties. They contemplated the usual course by which the corporation were in the constant habit of adopting streets voluntarily opened and dedicated by the proprietors. But suppose it had occurred to the minds of the parties, or the question had been put, what shall be done in the event that the corporation or the government should prohibit these streets from being opened? Can it be reasonably supposed that Jacobus Quick would have consented, or that Petrus Stuyvesant would have had the conscience to insist, that he should hold for his own use in

fee simple the ground thus conveyed to him by Quick for the intended streets without compensation?

If the act of 3d April, 1807, had not passed, there can be no doubt that equity would have compelled Mr. Stuyvesant to open the contemplated streets (Quick and Rensselaer) whenever the corporation or the government were ready to adopt and sanction them as public streets. That act has forbidden them to be opened; and shall this exercise of sovereign power to enure, to the benefit of Mr. Stuyvesant as to give him the land which the parties agreed to devote for those streets? Shall Quick not only lose the expected benefit of those streets, but lose his land also, without any equivalent? Shall Quick's deed to Stuyvesant for the streets stand, and become absolute for the exclusive benefit of the grantee, after the only object of the grant has been thus defeated?

The motives and consideration which induced Jacobus Quick to make the agreement were the advantages of three corner lots, and the benefit of fronting on the two contemplated streets; and as to these, the consideration has utterly failed. But Mr. Stuyvesant is equally well accommodated by Fourth and Fifth streets, laid out by the commissioners: he has lost nothing, has made no sacrifice; and he now seeks to appropriate to his own use the ground which Mr. Quick gave for the use of streets, which a subsequent law has forbidden to be opened.

The damages allowed by law for opening new streets do not include injuries arising from breach of contracts, or from failure of consideration in a deed. The appraisers had no jurisdiction to enquire into the equities of this case; and so far as Fourth-street, cut off a small part of the gore now in dispute, compensation (it must be presumed) was allowed to the defendant, he having the legal title to it.

The objection for want of parties, is not well founded; but even if new parties are necessary, the present bill is sufficient for the immediate purpose for which it was filed, to wit, to stay the ejectment at law; and the bill ought to be retained for that object till new parties can be introduced by amending the bill.

*P. A. Jay,* for the defendant. The court, after a lapse of thirty years, will not set aside solemn conveyances, when all the parties to them have long since died, merely upon conjecture concerning the inducements of the parties, without any pretence of mistake, and without any allegation of fraud.

1830.

Quick
v.
Stuyvesant.

The defendant and those under whom he claims, have been in possession more than thirty years. This is a bar even to a writ of right. The complainant could have no right of entry, nor could he lawfully enter upon the land he claims and erect a house upon it, without previously establishing his title in some court of law or equity.

If the complainant succeeds, it must be upon the ground, 1. That the consideration has failed ; or, 2. That Mr. Stuyvesant held the streets in trust to open them, or if that could not be done, to re-convey them to Quick.

1. How does the court know what were the considerations or inducements of Jacobus Quick in making this conveyance? Can the court guess them from the circumstances of the transaction, or from the valuation of the lands made by witnesses who testify to the value of lots thirty years ago? Can a decree of this court be founded upon guesses? Can the court divide the consideration of the conveyances, and say that the ground conveyed to Quick was the consideration for that conveyed to Stuyvesant, and that there was no consideration for the streets? Can the court be sure, or indeed can it be believed that Stuyvesant would have conveyed the lots at all, if he had not received a conveyance for the streets? Yet it is contended by the complainant that the streets ought to be re-conveyed, and that he should retain all the land conveyed by Stuyvesant.

But even supposing that the consideration has failed, will that authorize the court to decree a re-conveyance? Suppose the title to the land conveyed by Stuyvesant had failed, in that case, Quick would have had a remedy upon the covenants in his deed ; but we submit that his own conveyance could not have been rescinded.

Again, the lapse of time is an effectual bar. " If the equitable title be not sued upon within the time within which a le-

gal title of the same nature ought to be sued upon to prevent the bar created by the statute, the court acting by analogy to the statute will not relieve." (*Bond* v. *Hopkins*, 1 Sch. & Lef. 429. *Stackhouse* v. *Barnston*, 10 Ves. 466. *Dewdney*. *ex-parte*, 15 id. 496.)

2. Did Stuyvesant take as trustee? The deeds contain no declaration of trust; no covenant relating to the streets; nothing from which a trust can be inferred. There is no evidence that any trust was undertaken. Is it possible, then, that the court can decide first that there was a trust, and next define what it was? Even if the deed had contained an express covenant to open the streets, the law of 1807 rescinded that covenant. (*Brewster* v. *Kitchin*, 1 Ld. Raym. 317.) But the lapse of time will still be a bar, even if a trust should be implied.

It is true, that the case of a trustee is an exception to the rule stated above. But then the exception only extends to an avowed technical trustee; not the case of a trust fixed upon a man against his will, by implication of law, for the sake of the remedy. (*Townshend* v. *Townshend*, 1 Cox's Ch. C. 34. S. C. 1 Brown's Ch. C. 551. *Decouche* v. *Savetier*, 3 John. Ch. R. 216.)

3. But the original conveyances cannot be rescinded in part only; so that the complainant is to retain all that was conveyed to his father, and receive back what his father conveyed to Stuyvesant. If the conveyances are rescinded at all, they must be in toto. The parties must be restored to their original situation, for no fraud is imputed to Stuyvesant. But it is impossible to rescind the whole transaction upon this bill.

The complainant, in 1816, conveyed away to William Quick all his title to a part of the land contained in the deed executed by Stuyvesant. It is no answer to say that afterwards, in 1824, some of the children of William Quick purchased Quick street from the defendant. The complainant is unable to re-convey the land which his father received, and therefore cannot rescind the transactions by means of which it was received.

The complainant's bill ought to be dismissed, with costs.

THE CHANCELLOR. From the admissions in the answer, and the testimony in this cause, there can be no doubt as to the intentions and object of P. Stuyvesant and J. Quick at the time the conveyances of April, 1797, were executed. It was not the intention of either party to vest the title to the land included in Quick and Rensselaer-streets absolutely in Stuyvesant for his own use, or for any other purpose than that of opening a street over the same for the mutual accommodation of both parties. For the lands which Quick acquired under that arrangement, Stuyvesant received a full equivalent in the two pieces, at the north end and on the rear of the south end of Quick's land, which were conveyed to him for his own use. From the situation and value of the property, it is not probable that Quick would have consented to an exchange of lands, even to that extent, if he had not contemplated a greater benefit to his remaining property by the opening of the proposed streets. The particular mode in which the parties attempted to carry into effect their arrangement cannot alter their equitable rights, although the legal title to the land intended for the streets became thereby vested in Stuyvesant. If the manner of conveying had been reversed, and the legal title to the streets, through the Bowery farm to the East river, had been vested in Quick for the same object, the injustice of retaining that portion of the land for other purposes might have been more apparent; but the equity of the case would have been the same. The event which has happened was not contemplated by either of the parties at the time, and therefore was not provided for by their agreement. By an act of the government over which they had no control, the parties were prohibited from laying out and opening the contemplated streets. If such an event had been foreseen, it would unquestionably have been provided for in the conveyances. Courts of common law cannot supply defects of will, or rectify mistakes in written agreements or conveyances. Hence, with respect to matters of this kind, results the necessity of a court of equity, which, authorized by the principles of justice, ventures to correct words by circumstances, and to supply omissions in will, by conjecturing what would have been the will of the parties had they foreseen the event. This, in

*1830.*

*Quick
v.
Stuyvesant.*

law language, is to judge according to the presumed or implied will of the parties ; not that any will was interposed, but only that equity directs the same thing to be done which it is probable the parties themselves would have directed had their foresight reached so far. (Kaime's Prin. of Eq. 40.) Thus in *Newton* v. *Rowse*, (1 Vern. 460,) where a father articled his son to an attorney, and gave £120 with him, and the attorney died within three weeks thereafter, the executors of the latter were decreed to refund 100 guineas to the father. Every man who makes a covenant or executes a deed has an object in view which he proposes to accomplish, by means of the covenant or deed. They sometimes fall short of the end or object which was intended, and sometimes go beyond it. If the end proposed is lawful, a court of common law only enquires what acts of will were really exerted; and the deed or covenant is made effectual without regard to consequences. But courts of equity are more at liberty to *follow the dictates of refined justice*. They consider every deed in its true light, as a means employed to bring about some event; and in this light they refuse to give it force any farther than is conducive to the proposed end. In all matters whatever as well as in matters of law, the end is the capital circumstance; and the means are regarded so far only as they contribute to that end. Where a deed or obligation is sought to be made effectual in an event which is unexpected to both parties, a court of equity denies its authority. The party seeking to enforce it is unjust and inequitable in his demand, aud this furnishes a valid objection for the adverse party. (Kaimes' Prin. of Eq. 80, 81, 94.) These principles are constantly acted upon by this court, subject to such limitations and restrictions as are necessary to protect the rights of bona fide purchasers and others who have superior equities. Where, from any defect of the common law, want of foresight of the parties, or other mistake or accident, there would be a failure of justice, it is the duty of this court to interfere and supply the defect or furnish the remedy.

In this case if the street had been laid out and opened as originally intended by the parties, Quick would have had three valuable corner lots fronting on the Bowery Lane. By

the arrangement of the commissioners, two of them would have been destroyed or materially injured if the land appropriated for Quick and Renselaer streets was not restored to him. While on the other hand, Stuyvesant's property would be equally benefitted by the new streets as by those originally determined upon in 1797. The whole object of the conveyance of the land included in the streets, as well as the cause and consideration of that part of the conveyance having failed, justice and fair dealing evidently require a reconveyance of that land to the heirs of Quick. If the rights of the parties had not changed in other respects, perhaps the heirs of Quick might have insisted upon a re-exchange of the other lots. This however would present a case of more doubt; as there was a consideration, though as it turned out an inadequate one, for the exchange of lots. But that question cannot now arise, as it is put at rest by the compromise between the defendant and the heirs of William Quick. The only matter now in dispute relates to the land in Rensselaer street, in relation to which no persons except the parties in this suit have any claim or interest. This also disposes of the objection raised by the defendant's counsel, that all the proper parties were not before the court.

The remedy of the complainant is not barred by a lapse of time. Previous to the decision of the commissioners in 1811, Quick had no right to ask for a conveyance, as it could not be known before the plan of the city was completed and filed that they would not adopt the location of the streets as made by the parties in 1797. I do not understand that there has been any adverse possession, strictly speaking, since that time. The property was occupied together until the opening of the streets and avenue, in 1824. The heirs of Quick asserted their claim to these lands by their partition deeds in 1816. The right of the complainant to the strip of land now in controversy was again asserted in 1826, and by the subsequent erection of a house thereon. I do not notice the allegation in the answer, that the defendant paid the assessment on the strip of land in dispute for the expense of laying out and opening Fourth-street, as it does not appear to

be responsive to the bill, and the defendant has made no proof of the fact.

The result of my investigation in this case is, that the complainant is entitled to a reconveyance of the premises in controversy, north of and adjoining Fourth-street, which formerly belonged to Johannes Quick, and to his costs in this suit to be taxed. And the injunction heretofore granted in this cause must be made perpetual.