Opinion.

# Richmond.

## TAZEWELL COAL AND IRON CO. V. GILLESPIE AND OTHERS.

### January 18, 1912.

1. SPECIFIC PERFORMANCE—*Reformation—Mutual Mistake—Changed Conditions.*—A contract for the sale of real estate will not be specifically enforced, or reformed so as to correct a mutual mistake, where, without fault of either party, the circumstances and conditions of things have been so changed that the court cannot place the respective parties in the position they agreed to occupy by their contract.

2. SPECIFIC PERFORMANCE—*Reformation—Mutual Mistake—Changed Conditions—Hardship—Inability to Perform.*—Where specific performance of a contract for the sale of real estate is asked, as well as where reformation of an instrument is sought on the ground of mutual mistake, equity will refuse relief where the party against whom the relief is sought has been guilty of no fraud or other inequitable conduct, and there has been such a change in the circumstances and conditions of things, not contemplated by the parties, as would work a loss and hardship to him, and the party seeking relief has been rendered incapable of doing, substantially, all that he promised.

Appeal from a decree of the Circuit Court of Tazewell county. Decree for defendants. Complainants appeal.

*Affirmed.*

The opinion states the case.

*Henry & Graham* and *Phlegar, Powell, Price & Shelton,* for the appellant.

*Chapman & Gillespie, A. S. Higginbotham,* and *Henson & Bowen,* for the appellees.

CARDWELL, J., delivered the opinion of the court.

The appellant corporation was chartered by an act of the General Assembly of Virginia, approved April 28, 1887, (Acts Extra Session

1887, p. 122) and duly organized as a corporation May 31, 1887. Among the privileges granted the corporation by its charter was the right, from time to time, to purchase, lease, hold, and control in any manner, grant, bargain, sell, and convey, iron ore, mineral and other lands, and other rights and interests in lands situate in the counties of Tazewell, Wise, Dickenson, Buchanan, and Russell, and to receive real or personal property, suitable to the business of the company, in payment of subscriptions to its capital stock, the purpose of the incorporation being to take over, hold, and sell to the best advantage such lands as it might acquire in payment of subscriptions to its capital stock; and no stock seems to have been issued except for such lands or mineral rights. At the organization of the company, on May 31, 1887, A. J. May, S. D. May, J. V. Kelley, J. G. Watts, Frank Huger, George W. Gillespie, and J. S. Gillespie were made and constituted a board of directors, and the proceedings of this meeting were duly recorded in a book provided by the company for the purpose. Among the subscriptions made to the capital stock of the company by various persons at said meeting, in lands in fee, and coal and mineral rights, was one made by J. S. Gillespie, A. P. Gillespie, and Henry Bowen, in these words: "Ben Johnson, Dismal, 1,980 acres at $2.50 per acre, $4,950"; the legal title to which at the time was vested in J. S. Gillespie for the benefit of himself and A. P. Gillespie and Henry Bowen, all of whom signed, along with all other subscribers to the stock, a paper setting forth a tabulated statement of the individual subscriptions, spread *in extenso* on the record made and kept of the proceedings of the meeting.

The subscriptions of the lands for stock being in writing, signed by the parties, and accepted on the minute books by the stockholders and board of directors of the company, it commenced its operations, and all of the defendants to this suit, J. S. and A. P. Gillespie and Henry Bowen, appellees here, were directors of the company from its organization until in the year 1909, and for several years one of them was its president. It appears, however, that the subscription proposals, and the resolutions accepting them, adopted by the directors and by the stockholders, provided that "the said lands should be surveyed, if required by either party hereto or the persons from whom said lands were purchased,

and, when surveyed, the lands to be paid for, according to said survey, in stock at par to be issued by the said company, at the price per acre as herein set forth"; that the "Ben Johnson tract" subscribed by appellees was supposed to contain and had been theretofore treated as a 1,500 acre tract, but Peter Poston, from whom appellees purchased, and shortly before the subcription of the land to the stock of the appellant company, had caused a survey to be made of it, which showed 1,980 acres; that appellees, after the subscription, had a re-survey made by one P. H. Williams, who either fraudulently, because of interest in lands adjacent, or from mistake, reported only 1,572 acres and 92 poles in the tract, by which survey Poston described the land in a second deed to J. S. Gillespie, dated November 25, 1887; and appellees, by deed dated December 20, 1888, but not delivered until November 19, 1891, conveyed the land to the appellant by the same description as that given in Poston's deed. It further appears that the land was the northeast corner of a 10,000 acre patent, owned by George Warder and others, the eastern and northern lines of the tract being parts of the corresponding lines of the patent, their courses being N. 23° W. and S. 67° W.; that the draftsman of the deed under which Poston claimed, dated January 12, 1859, made one line of the course of the eastern boundary and the distance of the northern boundary, writing it N. 23 W. 270 poles to two spruce pines on Harry's Branch, and omitted the northern, or back line, altogether, when the calls should have been N. 23 W. 252 poles and S. 67 W. 670 poles, which error made the deed enclose nothing, as appears from exhibits filed with the deposition of S. D. May in this cause.

Both parties to this controversy agree that Poston acquired all of the land to both of said boundaries of the patent, and by his first deed of March 14, 1887, he conveyed all to J. S. Gillespie, for himself and his associates, A. P. Gillespie and Henry Bowen, and at the same time he and J. S. Gillespie entered into a contract to the effect that if, on a re-survey, there was more land than 1,500 acres, Gillespie would pay for the excess at one dollar per acre, and Poston would convey the land to him.

It was, as we have seen, by the Williams survey, that Poston made his second deed, dated November 25, 1887, to J. S. Gillespie,

conveying the Ben Johnson tract as containing 1,572 acres, and when appellant took its deed from appellees, dated December, 1888, the land was described as appeared in the Williams survey; but appellant knew nothing at that time, nor for many years after, of the errors committed by surveyor Williams, by which a triangular parcel of land was cut out of the Ben Johnson tract, containing 450.79 acres, which is the land here in dispute. Nor did appellant know, when it took the conveyance of the Ben Johnson tract from appellees as containing only 1,572 acres, nor for many years thereafter, of the agreement between Poston and J. S. Gillespie, entered into the same date of the first deed made by Poston to Gillespie, conveying the Ben Johnson tract as containing 1,500 acres.

It further clearly appears that appellees intended to subscribe the entire Ben Johnson tract for stock of the appellant company; that they intended to convey to the company the entire tract, and thought they had done so, until one S. M. Graham, who had surveyed the Warder tract, and other lands in that vicinity, showed them, by a diagram and explanations, that a part of said tract had been omitted from the Williams survey.

In the year 1905, for the first time, as it would seem clear, appellant had its suspicion aroused that the deed made to it by appellees December 20, 1888, did not convey all of the Ben Johnson land; such suspicion being aroused by information that surveyor P. H. Williams and his associates were claiming land next to the Warder back line, which the appellant company supposed was covered by its deed from appellees. Acting on this information, the board of directors of the company, at a meeting held June 8, 1905, appointed S. D. May and J. S. Gillespie (one of appellees) to have the land surveyed. May obtained all needed title papers prior in date to the deed to appellant, and, after some examination of them, discovered the omission of a part of the land intended to be conveyed, and at once disclosed his information to one of the appellees, who, instead of telling May that they had learned the facts from surveyor Graham, and were trying to get a deed from Poston, only replied with a promise to " look into the matter."

It further appears that at that time appellees had already begun efforts to obtain another deed from Poston for the omitted

lands, claiming that he was bound to make such a conveyance by his contract of March 14, 1887; but these facts were never divulged to any one connected with the appellant company until J. S. Gillespie testified in this cause, and the deed from Poston to J. S Gillespie, dated April 1, 1908, conveying to the latter the disputed land by metes and bounds, for the consideration expressed in the contract of March 14, 1887, was not filed for record till April 19, 1909. The appellees had, however, in the meantime, and in the early part of 1908, claiming under their first deed, placed a tenant on the disputed land, and had the timber thereon counted, which facts came to the knowledge of appellant in the spring of 1908, whereupon it proceeded to have its right to the land investigated and reported on by its attorney.

Upon consideration of the attorney's report by the stockholders and board of directors, at meetings held June 7, 1909, a committee was appointed to confer with appellees and procure a conveyance of the title to the disputed land, which committee was authorized to settle with appellees by paying stock of the company at $2.50 per acre of the disputed land and such sum as would have been paid as dividends on the stock had it been issued at the organization of the company, with interest on such dividends. This proposition was submitted to and rejected by appellees; whereupon the bill in this cause was filed July 31, 1909, and the said stock offered to appellees tendered with the bill, the object of the bill being to secure a conveyance from appellees of the 450.79 acres of land, part of the Ben Johnson tract, which, at the time of the contract between appellant and appellees sought to be enforced, was supposed to contain 1,980 acres, but which, by subsequent survey, was found to contain 2,023.365 acres, and which appellees sold and attempted to convey to appellant, though in fact they conveyed but 1,572 acres.

The bill sets out at length the facts stated above, and the further facts that the authorized capital of the complaining company was $2,000,000, its actual capital $194,233.65, but that the board of directors, at a meeting of which appellees were three of five present, on the 8th day of June, 1905, began proceedings which resulted in amending the charter so as to reduce the authorized capital to the amount of the outstanding capital stock; and that,

in order to tender to appellees the stock owing for the omitted 450.79 acres of land, the company had purchased of S. D. May the necessary shares.

The bill does not charge specifically intentional fraud on the part of appellees, but reliance for the relief it asks is upon the ground of mutual mistake as to the number of acres in the Ben Johnson or Poston tract of land and the true boundaries thereof.

Appellees filed a demurrer (which is not insisted on) and an answer to the bill. The answer takes issue with a number of the statements of fact contained in the bill, denies concealment of facts which appellant was entitled to know, and sets out the following as facts justifying them in refusing to correct the mutual mistake charged in the bill—to-wit:

'' The transaction as to the Ben Johnson tract was closed in good faith by the parties in the year 1891, but under what now appears to have been a mutual mistake, and the parties then stood and have since remained *in statu quo*—that is, the defendants had conveyed the 1,572 acres, received stock for that amount of land, and the company has never paid any part of the consideration for the omitted land.

'' The business of the plaintiff has been the holding, selling, and disposing of the 23,488 acres of land conveyed to the company by the promoters for the original stock. In the period between the stock subscription agreement and the discovery of the omitted land the plaintiff had sold, conveyed, and disposed of its lands and timber to the extent of over 20,000 acres, and had reduced its holdings to about 3,500 acres. The original holdings were valued at $202,000, for which that amount of the original stock of the company was to be issued at par on the fair valuation of the lands, in 1887, the Ben Johnson tract being valued at $2.50 per acre at that time. When the mistake was discovered and suit brought, the holdings of the company were about 3,500 acres, worth not over $110,000 and the outstanding capital stock amounted to $194,233.63, making the value of the stock tendered about fifty-five cents on the dollar.

The omitted land is now worth about $40.00 per acre. The plaintiff has disbursed, out of the proceeds from sales of its lands and timber, over $275,000 in dividends upon the original stock

subscribed for and issued to the promoters. This original stock has already received 142 *per cent.*, and will receive in all, when the balance of the holdings are disposed of, enough to make about two dollars for one of the par value of the stock. The 1909 stock tendered with the bill cannot pay over fifty or sixty cents on the dollar. The potential and actual value of the stock subscribed for by the defendants has greatly depreciated. The land has increased in value sixteen to one.

"When the mistake was discovered and the company claimed the land, it had issued and had outstanding the full amount of its stock which, under the law, it was authorized to issue. By its charter, its maximum capital was fixed at $2,000,000, but in 1905, desiring to avoid taxation on that amount, it had its charter amended and its maximum capital reduced and fixed at the exact amount of its outstanding capital stock on that date, which was $194,233.63. For this reason, when the company decided to sue for the land, it was not in a position to issue any stock and had no power to do so. The company's attorneys and officers, knowing and recognizing this, devised a plan to obviate the difficulty, and to enable, as they conceived, the plaintiff to issue and tender stock. The plan was for S. D. May to turn over to the company fifteen shares of his stock, the company agreeing to pay him any and all dividends which might thereafter accrue on that amount of capital stock; and the company, having cancelled this stock, turned over by Mr. May, undertook to issue and tender stock to the defendants."

Upon the hearing of the cause on the bill and answer, and exhibits filed therewith, and depositions taken on behalf of the respective parties, the circuit court denied the relief asked in the bill, and dismissed the cause.

Were it charged and proven that appellees, by intentional fraud, prevented appellant from obtaining title to the whole of the Ben Johnson tract of land under its subscription by appellees to the capital stock of the company, and while the company's condition was such that it could perform its part of the contract, the case would be very different from that made by the record—viz., that the failure of appellant to obtain title to the whole of the land

grew out of a mutual mistake, not discovered by either party until conditions had so changed as to make it questionable, at least, whether or not a court of equity should undertake to correct the mistake.   The facts set up in appellees' answer as to the changed conditions of the appellant, quoted above, are not seriously controverted.

Whether the bill of appellant be treated as a bill for the specific enforcement of the contract of subscription by the appellees of the Ben Johnson land to the capital stock of the company, or as a bill seeking the reformation of the contract, on the ground of mutual mistake, the crucial question for determination is, whether or not, under the facts and circumstances proven and going to show the condition of the contracting parties with respect to their ability to perform the contract according to its intent and purpose, or correct the mutual mistake of which the appellant complains, it is in a condition to perform the contract on its part.   In other words, can the contract be specifically enforced or reformed so as to correct the mutual mistake, and thereby place the respective parties in the position they agreed to occupy by their contract with respect to the Ben Johnson tract of land?

We do not think that *laches*, on the part of appellant, can, under the circumstances, disentitle it to the relief sought, and, if this relief has to be denied, it must be upon the ground that the appellant has not offered, and is unable to offer, to perform the contract so that appellees can receive substantially what they contracted for.

Certainly a court of equity could not rightly compel appellees to convey the omitted land to appellant unless the latter was in a position to substantially comply with the terms of the contract with respect to the consideration for the conveyance to which the former would be entitled.

The changed condition of appellant, with respect to its ability to carry out this contract, cannot be, under the facts and circumstances already stated, imputed to the appellees any more than to appellant, acting as a corporate body.   All of the parties, doubtless, acted in the matters which brought the affairs of the company to the status they occupied when this suit was brought in good faith, for up to certainly 1905, and over seventeen years after the company was organized, and after its authorized capital was reduced.

to the amount of the outstanding or actual capital stock, all parties concerned were ignorant of the fact that a part of the Ben Johnson land had been omitted from the conveyance by appellees, delivered to and accepted by the company in 1891. Had the sale of this tract of land to the company been as a whole and not by the acre, as it was, and the company had paid the whole purchase money, the authorities cited for appellant, in the argument for the proposition that courts of equity have jurisdiction to, and, in a great number of cases, have reformed instruments on the ground of mistake, would apply to this case. But that is not this case. Here the appellant has not performed as to the omitted land, and, by reason of changed conditions, for which appellees are not censurable, it cannot perform and pay for the land according to the original spirit and intent of the agreement.

In no view that we have been able to take of the case could the relief sought by appellant be granted, without giving the company more, and appellees less, than the spirit and intent of their contract would justify. Appellant would get land that has appreciated greatly in value since the contract was entered into, while appellees would be compelled to take stock therefor that has materially decreased, and cannot, by reason of the changed conditions surrounding the situation of the appellant, appreciably increase in value. Such a result would not be justified, in view of the facts already stated, but, in an effort to correct what was a mutual innocent mistake on the part of both contracting parties, a hardship would be imposed on one of them.

Authority is abundant for the proposition that one of the highest prerogatives and one of the favorite subjects of equity jurisprudence is to give relief against the consequence of mistake and accident; but not only must the evidence be sufficiently cogent to satisfy the mind of the court, to justify reformation of a contract on the ground of mutual mistake, but the relief afforded must be fair and just to both parties litigant; especially so in the absence of fraud or other inequitable conduct on the part of the party against whom the relief is sought. We have been cited to no case, and none has been found by us, where a court of equity has decreed the relief sought in this case, where the facts were substantially as they are here.

"Courts of equity will not exercise jurisdiction in specific performance where it would impose hardship on people not censurable in conduct, and where the circumstances and conditions of things have been so changed as to work loss and hardship to them." *Dyer* v. *Duffy*, 39 W.. Va. 159, 19 S. E. 540.

Where specific performance is asked, as well as where reformation of an instrument is sought, on the ground of mutual mistake, and where the element of hardship and injustice comes into the case through a change in circumstances not contemplated by the parties when the contract was entered into, the relief will not be granted. *Quick* v. *Stuyvesant*, (N. Y.) 2 Paige 84; *Fitzpatrick* v. *Dooland*, (N. Y.) 37 Hun. 291; *Hale* v. *Wilkinson*, 21 Gratt. (62 Va.) 90; *Garnett* v. *Macon*, 6 Call (10 Va.) 308. This rule is fully sustained in *Newberry* v. *French*, 98 Va. 479, 36 S. E. 519.

In the case of *Garnett* v. *Macon*, *supra*, the opinion by Marshall, C. J., says: "A court of equity compels the specific performance of contracts, because it is the intention of the parties that they should be performed. But the person who demands it must be in a capacity to do, substantially, all that he has promised, before he can entitle himself to the aid of this court."

The same subject is dealt with at p. 617, 36 Cyc, and a number of cases cited. See also Pom. Eq., sec. 1407; *Cox et als.* v. *Cox*, 26 Gratt. (67 Va.) 309.

"While, therefore, no positive rule can be laid down by which the action of the court can be determined in all cases, it may be stated, as a general rule, that specific relief will be usually granted when it is apparent, from a view of all the circumstances of the particular case, that it will subserve the ends of justice; and that it will be withheld where, from a like view, it appears that it will produce hardship or injustice to either of the parties." Michie's Dig., Vol. 12, p. 570, and cases cited.

Leaving out of view the plan by which appellant obtained the requisite stock, from one of its stockholders, to tender to appellees, in payment for the omitted Ben Johnson or Poston land, we have stated enough of the facts to show that the changed conditions of the company are such that the relief asked in its bill, in view of the principles of equity to which we have adverted, could not be decreed without imposing an unwarranted hardship upon appellees.

We are further of opinion that the authorities cited for appellant for the proposition that appellees' relations to the company were of a fiduciary character, and for that reason they are estopped to deny the right of appellant to the relief it seeks against them, have no controlling influence as applied to the facts of this case.

The decree of the circuit court complained of has to be affirmed.

*Affirmed.*